IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

MARK W. CRANE,                          )
                                        )
                Plaintiff,              )
                                        )
                                        )
v.                                      )        No. 3:10-CV-149
                                        )
MONTEREY MUSHROOM, INC.,                )
                                        )
                Defendant.              )

## MEMORANDUM OPINION

This civil action is before the court for consideration of the "Motion for
Summary Judgment of Defendant Monterey Mushrooms, Inc." [doc. 24]. Plaintiff has filed
a response [docs. 36, 37], and defendant has submitted a reply [doc. 38]. Oral argument is
unnecessary, and the motion is ripe for the court's determination.

Plaintiff has brought suit pursuant to the Americans with Disabilities Act
("ADA"), 42 U.S.C. § 12101 *et seq*., and the Family and Medical Leave Act ("FMLA"), 29
U.S.C. § 2601 *et seq*., for alleged discrimination related to the termination of his employment
with defendant. For the reasons that follow, defendant's motion will be denied.

I.

*Background*

Defendant grows and ships fresh and processed mushrooms, and it has operating facilities in several states, including Tennessee. In 2004, defendant hired plaintiff as an Engineering Manager in the Technical Services division, which was responsible for engineering capital projects. Capital projects involved making improvements or alterations to company facilities using capital rather than operating expenses. The Director of Technical Services, Mike Salewske, was hired in 1983, and he was the person to whom plaintiff reported. The other employees in the division were Mike Egan, the Construction Project Manager, who was hired in 1993 and a carpenter who worked in California. Salewske was located in California while plaintiff's office was in Knoxville, Tennessee. Plaintiff testified that 70% of his job involved capital improvements and 30% involved operational improvements. The multiple performance evaluations he received during his employment showed him to be "good or above-average." Salewske considered plaintiff to be a competent engineer who knew the equipment, packing lines, and controls.

In the spring of 2008, defendant began losing money and continued to do so for a number of months. Cost-cutting measures were implemented, which included Shah Kazemi ("Shah" or "Kazemi"), the President and CEO of Monterey Mushrooms, Inc., directing that each facility reduce its total head count, including salaried positions, by 10%. Kazemi met with Salewske in October of 2008 regarding capital projects for the coming fiscal year. According to Kazemi's affidavit testimony, he informed Salewske that because

2

capital dollars were so tight, new procedures for capital project approval would be implemented along with management to control costs. He informed Salewske that until procedures were in place, no capital improvements would be approved for fiscal year 2009.

Kazemi met with Ray Selle, the Chief Financial Officer, in October/November 2008 to discuss corporate positions for elimination. Selle prepared a spreadsheet that identified corporate-level positions for possible elimination by March 2009, which included plaintiff's and Mike Egan's positions. Kazemi and Selle did not consult with Salewske regarding the positions to be eliminated. Salewske stated that he had no involvement in the decision to eliminate plaintiff's and Egan's positions.

In December 2008, plaintiff learned he had a high PSA and that his doctor suspected he had prostate cancer, which would need to be confirmed by a biopsy. Plaintiff informed Salewske of the situation. Salewske has testified that he did not inform Kazemi, Selle or other management personnel about plaintiff's cancer concern at that time, and Kazemi testified that he did not discuss plaintiff's cancer with Salewske. Selle testified that he did not learn about plaintiff's cancer until he had been terminated. Kazemi testified that Salewske did not discuss the possibility of plaintiff's having cancer in December 2008 and that he first learned about the cancer when he was informed of the confirmed diagnosis in January 2009. Plaintiff has testified that Salewske informed Kazemi in December 2008 and that he was angry and upset about his needing to be out of work. He also testified that he received the same response through Salewske after he had received his diagnosis. Plaintiff's

3

diagnosis of prostate cancer was confirmed on January 13, 2009. Plaintiff informed Salewske of the diagnosis, and Salewske in turn notified Kazemi via email on January 14, 2009. Other management people also became aware of plaintiff's condition.

Kazemi testified that in December 2008 he reviewed the 2008 financials which showed increasing sales deficits. It was at that time Kazemi says he finalized the earlier decision to eliminate the positions held by plaintiff and Egan. However, he testified that he wanted to wait until after the holidays before he had Salewske notify plaintiff and Egan of the decision. On February 2, 2009, Kazemi informed Salewske that plaintiff and Egan would be laid off. The next day, Salewske called plaintiff and told him he was laid off effective March 1, 2009. Shortly after, Salewske informed Egan that he too was laid off effective March 1, 2009. On February 4, 2009, Plaintiff requested information regarding FMLA from the human resources ("HR") department, and he applied for FMLA on February 5, 2009. Sylvia Ayala, the Corporate HR Manager, completed plaintiff's termination form on February 4, 2009.

In support of his FMLA claim, plaintiff had his treating physician, Dr. McDonald, submit a "Certification of Health Care Provider." Dr. McDonald stated that plaintiff would receive treatment beginning February 27, 2009, and his recovery time would be approximately two weeks. The doctor estimated that plaintiff's period of incapacity would be from February 27, 2009 through March 12, 2009.

4

After plaintiff's position was eliminated, Salewske took over plaintiff's projects and absorbed some of his job duties. The record also reflects that no one has been hired to replace the plaintiff.

## II.

### *Standard of Review*

Defendant's motion is brought pursuant to Federal Rule of Civil Procedure 56, which governs summary judgment.[1] Rule 56(a) sets forth the standard for governing summary judgment and provides in pertinent part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The procedure set out in Rule 56(c) requires that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion." This can be done by citation to materials in the record, which include depositions, documents, affidavits, stipulations, and electronically stored information. Fed. R. Civ. P. 56(c)(1)(A). Rule 56(c)(1)(B) allows a party to "show[] that the materials cited do not

---

[1] Federal Rule of Civil Procedure 56 was amended effective December 1, 2010. The Advisory Committee Notes to the 2010 amendments reflect that the standard for granting summary judgment "remains unchanged," and "[t]he amendments will not affect continuing development of the decisional law construing and applying [that standard]." Fed. R. Civ. P. 56 advisory committee's note. The summary judgment motion in this case was filed after the revised version became effective and therefore is governed by that version. *Cf. Wheeler v. Newell*, No. 09-4549, 2011 WL 204457, at *3 n.3 (6th Cir. Jan. 24, 2011) ("The motion for summary judgment in this case was filed prior to December 1, 2010, and is governed by the version of Rule 56 that was in effect at the time the motion was filed.").

establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

After the moving party has carried its initial burden of showing that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party to present specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)).

In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *Id.* at 255. The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52.


III.

*Analysis*

**Alleged Statements of Direct Discrimination**

Before the court considers plaintiff's claims under the ADA and FMLA, certain statements that plaintiff contends represent direct discrimination need to be addressed.

6

Defendant contends that all of the statements are hearsay and inadmissible, while plaintiff claims they are admissible statements showing direct discriminatory motive by defendant. For the reasons that follow, the court concludes that plaintiff has not presented any direct evidence of discrimination.

In the context of discrimination cases, direct evidence "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). "[D]irect evidence of discrimination does not require a factfinder to draw any inferences" regarding a discriminatory motive. *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003); *see also Norbuta v. Loctite Corp.*, No. 98-3013, 1999 WL 357780, at *1 (6th Cir. May 20, 1999) ("[D]irect evidence proves the existence of a fact without any inferences or presumptions.").

The statements can be placed in three groups for analysis. The first group consists of the alleged statements made to plaintiff by Salewske that predict that Shah will not like plaintiff being off work for cancer treatment. Plaintiff testified that he told Salewske in December 2008 that he had a high PSA and there was a possibility of his having prostate cancer. Salewske asked him how long he would be out, and Salewske said "Shah will not like this." Plaintiff also testified "Mike Salewske told me mid-December that Mike would not - - that Shah would not like that I'm going to have to take FMLA and have prostate cancer." Salewske denies he made any of these statements to plaintiff.

7

While Salewske was plaintiff's supervisor, the record is clear in spite of plaintiff's arguments to the contrary that he was not the decision maker in this case. He stated by affidavit that he does not have the authority to hire and fire anyone. Although he signed off on plaintiff's termination, that was a ministerial act. Salewske did not take part in the RIF decision, but he testified that he agreed with terminating plaintiff because he did not have work for him. He stated that he was told about the decision to lay off plaintiff on February 2, 2009, the day before he notified plaintiff. The record does not support plaintiff's contention that Salewske was a decision-maker in this case.

These statements attributed to Salewske cannot be direct evidence because they are not made by the decision-maker. The Sixth Circuit has held that "comments made by individuals who are not involved in the decision-making process regarding the plaintiff's employment do not constitute direct evidence of discrimination." *Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003) (citing *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 433 (6th Cir. 2002)).

Furthermore, the statements if made are "naked, unsupported speculation and inference," *Mitchell v. Metro. Gov't of Nashville & Davidson Cnty.*, No. 3:10-cv-0457, 2011 WL 1748582, at *5 (M.D. Tenn. May 6, 2011), made by Salewske as to how Shah would react, and allegedly show Shah's discriminatory motivation. Even if the statements were offered directly through Salewske, the evidence would not be admissible under Federal Rule of Evidence 701. "The rule limits opinion testimony from a lay witness to 'opinions or

8

inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702'" *Id.* There is no evidence in the record that Salewske's opinion regarding how Shah would react was rationally based on Salewske's perceptions. The opinions are outside Rule 701. The court will not consider the statements attributable to Salewske regarding his prediction about how Shah would not like plaintiff's being off for his cancer treatment.

Plaintiff further states that Salewske also told him later in the month of December 2008 that "Shah was angry and upset that I had prostate cancer, and that I'd have to take FMLA, and it would disrupt the projects." Defendant contends that this is not direct evidence of discrimination and it is also hearsay. In support of its contention that the statements by Shah and Salewske are hearsay, defendant argues that Salewske was not a decision-maker and cites the court to numerous cases. Plaintiff argues that the content and timing of the statements make them direct evidence and to support his position that the statements are not hearsay, citing *Carter,* 349 F.3d at 274-276 and *Peyton v. Kelermeyer Co.*, 115 F. App'x 825 (6th Cir. 2005) (testimony regarding what plaintiff's supervisor said owner of company told him not hearsay because made by party agent within scope of employment). Salewske denies making the statement to plaintiff about Shah's comments. Statements that are hearsay cannot be considered on a motion for summary judgment. *See Wiley v. United States*, 20 F.3d 222, 225-26 (6th Cir. 1994).

9

The statement attributed to Salewske involves two out-of-court statements, Shah's comments and Salewske's recitation of them to plaintiff. Plaintiff must provide an independent basis for the admission of both statements. *See* Fed. R. Evid. 805. "Evidence containing multiple levels of hearsay is inadmissible for its truth unless each layer, analyzed independently falls within an established hearsay exception or is treated as nonhearsay." *DeBiasi v. Charter Cnty. of Wayne*, 537 F. Supp. 2d 903, 911 (E.D. Mich. 2008) (citing Fed. R. Evid. 805; *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1081 (6th Cir. 1999)); *see also United States v. Gibson*, 409 F.3d 325, 337 (6th Cir. 2005) ("[I]n order for double-hearsay statements to be admissible, both statements must be excluded from the hearsay definition.").

Federal Rule of Evidence 801(d)(2)(D) provides that a statement is not hearsay when the statement is offered against an opposing party and it "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Shah's comments to Salewske qualify as an admission by a party, which is not hearsay. As president and CEO of Monterey Mushrooms, Inc., Shah was speaking on matters within the scope of his employment, for example, matters related to ongoing projects within the company and the absence of an employee. However, there must be a basis for admitting Salewske's statement to the plaintiff, the retelling of Shah's comments.

Salewske's retelling of Shah's comments is a party admission and admissible if he made the statement within the scope of his employment. Whether a statement is within

10

the scope of employment is beyond just determining if the declarant is a decision-maker related to the adverse employment action. *Carter*, 349 F.3d at 275 ("scope of employment" criterion extends beyond direct decision-makers). "The test is whether the statement *concerns* a matter within the scope of the agency or employment." *Jacklyn*, 176 F.3d at 928. Salewske was plaintiff's supervisor and therefore was directly involved with the company projects on which plaintiff was working. Also as plaintiff's supervisor, Salewske would be involved with plaintiff's use of FMLA leave, perhaps even responsible for approving it. Thus, Shah's comments about company projects and plaintiff's use of FMLA leave fall within the scope of Salewske's employment and are a nonhearsay party admission. *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 722 (6th Cir. 2006) (employee with responsibility for managing promotional process was within his authority when speaking on matter of promotions); *Wilson v. Budco*, 762 F. Supp. 2d 1047, 1061 (E.D. Mich. 2011) (comments about employee "squarely within the scope of [declarant's] employment" as she was supervisor who evaluated employees working under her, including employee about whom she commented).[2]

       While admissible, the statements are not direct evidence of discrimination. In December 2008, plaintiff did not have a confirmed diagnosis, although the statement

---

[2] Plaintiff also testified that Salewske asked him on more than one occasion how long he would be out for his treatment. Since Salewske was plaintiff's supervisor and would be directly involved with plaintiff's absence from work, his inquiries to plaintiff were within the scope of his employment and not hearsay. However, the statements are not direct evidence because Salewske was not the decision-maker in this case. *Hopson*, 306 F.3d at 433.

attributable to Shah through the plaintiff represents that he had prostate cancer. In addition, the factfinder would need to draw inferences and make assumptions in order to find that Shah's anger translated into a motivation to discriminate.

Plaintiff also testified that there were several phone calls with Salewske after the diagnosis was confirmed in which he says Salewske told him the same thing, that Shah was angry and upset that he had prostate cancer and would need FMLA leave and that it would disrupt the projects. These statements would be admissible for the same reasons as set forth above for the December 2008 statement. Also for the same reasons already stated, these statements do not represent direct evidence, since inferences must be drawn and assumptions made. Again, Salewske denies making any statements to plaintiff about Shah's being angry and upset about his condition or need for leave.

Plaintiff also testified that after Shah learned about plaintiff's diagnosis, Shah called him. Plaintiff testified, "He didn't want to talk about my condition. All he wanted was to go over a list of projects and status. Was very irritated, angry. He was very - - he didn't care about me at all." Shah's comments are admissible as nonhearsay under Rule 801(d)(2)(D). However, this is not direct evidence of discrimination. All it shows is that plaintiff and Shah had a conversation after Shah learned of plaintiff's diagnosis and plaintiff perceived Shah to be angry and upset. Plaintiff's condition was not discussed, so Shah could have been angry and upset for any number of reasons during the conversation. Assumptions and inferences have to be made and speculation has to be employed to reach the conclusion

that Shah was angry and upset because of the diagnosis. This is not direct evidence. *Norbuta v. Loctite Corp.*, 1999 WL 357780, at *1 ("[D]irect evidence proves the existence of a fact without any inferences or presumptions.").

In addition, plaintiff offers his testimony about what he learned from other employees at Monterey Mushrooms. He stated, "And I was concerned about this [Shah's alleged anger about his taking time off] because other members of Monterey Mushrooms has (sic) told me that Shah does not like people taking time off. He looks at it as stealing from the company. . . . Just general conversation with other management people that know Shah a lot more than I do." This presents a double hearsay problem. While the comments attributed to Shah would fall within Rule 801(d)(2)(D) as nonhearsay, the retelling of the comments by the "other members"of the company – "other management people" is hearsay. Both statements must be admissible. *Gibson*, 409 F.3d at 337("[I]n order for double-hearsay statements to be admissible, both statements must be excluded from the hearsay definition."). These employees are not even identified, so there is no basis for determining whether such statements by them would be made within the scope of their employment or agency to qualify their retelling as nonhearsay. Plaintiff has the burden of establishing the proper foundation for admissibility of statements. *Liadis v. Sears, Roebuck & Co.*, 47 F. App'x 295, 303 (6th Cir. 2002). He has offered nothing to show that the statements are not hearsay or that they are admissible under a hearsay exception. Therefore, the statements are not admissible, and the court will not consider the alleged comments of Shah that plaintiff says he heard from

13

others at the company.

Finally, plaintiff offers the following deposition testimony regarding Shah's attitude:

> Q. Do you know of any other employees at Monterey Mushrooms who took time off for illness?
>
> A. I know of one. David Fullington's wife was diagnosed with prostate (sic) cancer and Dave took some days off to be with his wife. And I just happened to be in Royal Oaks and Shah came down and asked where Dave was. And I said I don't know. And he said F this stuff, shit, and Dave's got a job to do and he should be here.
>
> Q. So you personally heard Shah say that?
>
> A. Yes.

Again, Shah's comments qualify as nonhearsay under Rule 801(d)(2)(D). They do not, however, qualify as direct evidence of discrimination. A factfinder would have to draw inferences and make presumptions in order to conclude that Shah's displeasure with Fullington translates into a discriminatory motive against the plaintiff for taking FMLA leave. The excerpt does not specifically make clear that Shah knew that Fullington was off taking care of his wife when he made the comments. Plaintiff sets the background that Fullington's wife had cancer and he took some days off. However, when Shah asked where Fullington was, plaintiff replied, "I don't know." Then Shah made the comments about Fullington having a job to do etc. The testimony excerpt does not make the clear that Shah knew Fullington was out because he was taking care of his wife. Thus, presumptions and

14

inferences have to be applied to Shah's comments to reach the conclusion plaintiff does, that

Shah was upset because Fullington was off taking care of his sick wife. The testimony

shows Shah was annoyed that Fullington was not at work, but it is not direct evidence of

discrimination.


## ADA Claim

To demonstrate a prima facie case of disability discrimination, plaintiff must

show that:

> 1) he or she is disabled; 2) otherwise qualified for the position,
> with or without reasonable accommodation; 3) suffered an
> adverse employment decision; 4) the employer knew or had
> reason to know of the plaintiff's disability; and 5) the position
> remained open while the employer sought other applicants or the
> disabled individual was replaced.

*Whitfield v Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011) (clarifying that the proper test for

a prima facie case of discrimination under the ADA is stated in *Monette v. Elec. Data Sys.*

*Corp.*, 90 F.3d 1173 (6th Cir. 1996)). If plaintiff presents a prima facie case, the burden

shifts to the employer to articulate a legitimate, non-discriminatory reason for the

employment action. *Monette*, 90 F.3d at 1185-86. Once the defendant has done so, the

burden shifts back to the plaintiff to show that the proffered reason is pretextual. *Id*. at 1186-

87. Ultimately, plaintiff must demonstrate that "but for" his disability, he would not have

been terminated from his position. *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312

(6th Cir. 2012). In *Lewis*, the Sixth Circuit adopted the "but for" causation standard in Age

15

Discrimination in Employment Act cases as explained by the Supreme Court in *Gross v. FBL Financial Services*, *Inc.* 557 U.S. 167 (2009). Thus, plaintiff must show that but for his disclosing to defendant that he had prostate cancer he would not have been terminated. *Cf. Hudson v. Insteel Indus., Inc*., 5 F. App'x 378, 382 (6th Cir. 2001) (plaintiff must show that age was determining factor in employer's decision – that adverse employment action would not have occurred but for employer's motive to discriminate on basis of age).

      Since this case involves a RIF situation, there is a heightened prima facie burden that plaintiff must meet. *Geiger v. Tower Automotive*, 579 F.3d 614, 623 (6th Cir. 2009). "[B]ecause the most common legitimate reason for the discharge of a plaintiff in a [reduction in force] situation is the work force reduction, the plaintiff must provide additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Id.* at 624 (internal quotation marks and citations omitted). This additional showing can usually be met by demonstrating that a "comparable non-protected person was treated better." *Williams v. Emco Maier Corp*., 212 F. Supp. 2d 780, 784 (S.D. Ohio 2002) (citation omitted) (modified fifth prong of ADA prima facie showing in RIF case whether plaintiff presented additional evidence to show she was singled out for termination for impermissible reasons.).

      "A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company. An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her

discharge." *Geiger*, 579 F.3d at 623 (quoting *Barnes v. GenCorp*, 896 F.2d 1457, 1465 (6th Cir. 1990)). However, an employee is not considered replaced when his or her duties are taken over by another individual "or when the work is redistributed among other existing employees already performing related work." *Id*. (quoting *Barnes*, 896 F.2d at 1465).

Plaintiff attempts to discredit the legitimacy of the RIF by arguing that freezes on capital projects were routine; the number of corporate employees increased; and according to Shah the number of employees now is approximately the same as in 2009. Defendant denies that freezes on capital improvements were routine, and the record is well documented that prior to plaintiff and Mike Egan being laid off, the company was experiencing financial difficulties and at one point was "bleeding cash." A RIF involves "business considerations," and in the Sixth Circuit it does not necessarily have to be driven by economic necessity. *Payne v. Goodman Mfg. Co.*, *L.P.* 726 F. Supp. 2d 891, 901 (E.D. Tenn. 2010) (citing *Barnes*, 896 F.2d at 1465). In this case the business considerations included economic necessity. A number of other employees were also laid off, in addition to the plaintiff and Egan, based upon the company's economic situation. Employees continued to be laid off in February 2009 after plaintiff and Egan. Plaintiff's conclusion that "Defendant has blown the matter way out of proportion to try to cover-up the illegal firing of the Plaintiff" is not supported by the record.

In addition, simply because the total number of employees may be about the same now as when plaintiff was terminated does not mean that a RIF did not occur. The

same is true regarding plaintiff's assertion that the number of corporate employees increased since he left the company. "[T]he fact that the company employs more people today than it did at the time of [plaintiff's] termination does not mean that the company did not, in fact, engage in a RIF two years ago. Surely, a company facing financial hardships may wish to eliminate certain positions in an effort to alleviate those difficulties, while still adding other positions in an effort to improve the company's operations."*Williams*, 212 F. Supp. 2d at 785 (and cases cited therein).

Further, the record shows that plaintiff was not replaced. No one has been hired for his position, and no one has been reassigned to his position. Salewske has testified by affidavit that plaintiff's position remains eliminated and that he has absorbed some of plaintiff's job duties. In spite of plaintiff's arguments to the contrary, the court finds that this case does in fact involve a RIF situation.

Defendant argues primarily that plaintiff cannot make out a prima facie case of ADA discrimination because he cannot show that he was replaced and also he cannot meet the heightened prima facie burden in a RIF case of showing that he was singled out for discharge for impermissible reasons. Plaintiff does not address the issue of his not being replaced in the discussion of his prima facie case. He states there is evidence that he is qualified and that he was discharged due to his disability, referring the court to ten pages of stated facts in his brief. Plaintiff attempts to discredit the RIF and does not address the heightened burden at the prima facie stage in a RIF case.

18

Plaintiff clearly has not made out a prima facie case under the ADA under the standard elements because he was not replaced. His position was eliminated, and no one has been hired to replace him. However, because this is a RIF case, the last prong of the prima facie case is modified, so the court will look at whether plaintiff has presented direct, circumstantial, or statistical evidence tending to show that he was singled out for termination for impermissible reasons in order to establish his prima facie case.

Plaintiff offers a of variety facts to show issues concerning defendant's motives. Plaintiff argues that Shah knew in December 2008 about his cancer and that he had an adverse reaction. This is shown by plaintiff's testimony that Salewske told plaintiff later in December 2008 that "Shah was upset and angry that I had prostate cancer." At that point, of course, the diagnosis had not been confirmed, although plaintiff had symptoms. Plaintiff also refers to the EEOC charge in which a response states, "At some time, approximately December 2008, . . . Mr. Salewske informed Mr. Kazemi of [complaining party's] concern about prostate cancer . . . ." Defendant points out that the EEOC response was prepared by counsel and not sworn to by anyone at Monterey Mushrooms and there are no assertions that are inconsistent with the reasons given for plaintiff's termination, citing *Sharon Council v. Tri-Star Constr. Co.*, No. 01Civ. 11788, 2004 WL 253298, at *3, n.4 (S.D.N.Y Feb. 10, 2004) (court did not find inference of discrimination where reason given in statement to EEOC was admitted by defendant to be untrue and statement "was prepared by counsel and not sworn to or verified by any employee of [defendant]" but reasons, including those given

19

to plaintiff at termination, did not change). Plaintiff also argues that Salewske told him after the diagnosis was confirmed that Shah was angry and upset because it would "disrupt the projects."

Viewed in the light most favorable to the plaintiff as required on summary judgment, a factfinder could infer from these facts that Shah knew of plaintiff's cancer as early as December 2008 and that he was angry and upset with the plaintiff because of his cancer. In this RIF situation, plaintiff must show that he was singled out for termination for impermissible reasons. As it relates to his ADA claim, it is the fact of his cancer. Shah's having prior knowledge of plaintiff's cancer before making the final decision and his attitude toward plaintiff concerning his condition may or may not show that plaintiff was singled out in this RIF context. However, viewed in the light most favorable to the plaintiff, a factfinder could infer that they led to plaintiff being singled out because of his cancer.

Also in support of his contention that the decision to terminate him came after or in connection with his diagnosis, plaintiff offers that Ayala received the termination information at the "last minute." At her deposition she was questioned about an email which states, "Sorry Charlene, we actually have 5 terminations for this pay period . . . this was very last minute and I had to wait for Shah to approve because of severance money. I waited until 5:30 last night for Shah to approve . . . anyways they have been approved."

Q.   What did you mean when you said, "this was very last minute"?

A.   It was probably last minute. Maybe I didn't get the

20

information.  I processed all the salary terminations, and whether they're resignation or terminations, maybe I got the information late.  I have a deadline for – we have a payroll deadline.

Q.    I see.  So that could be that you learned at the last minute that the five people would be terminated?

A.    Looks like there was problems with the time sheets.  Yes. There was five layoffs, and all of them, I believe, were – I'm just reading the second paragraph.

The five layoffs included plaintiff and Egan.  While defendant argues that the testimony only shows that Ayala received the paperwork late, in the light most favorable to the plaintiff, a finder of fact could draw other inferences regarding timing of the layoffs.

In addition, plaintiff points to the journal entry and deposition testimony of Salewske to support his argument that the final decision was made with knowledge of his cancer and within temporal proximity of his diagnosis.  On January 9, 2009, Salewske made an entry in his journal to the effect: "need to look at reduction and Mark and Mike's role and who will pick up slack."  In his deposition, Salewske testified in relevant part regarding this entry:

Q.    And now, why did you write that?

A.    Because we were going to have a staff reduction.

Q.    Who told you that?

A.    Shah Kazemi.

. . .

Q.    Did he say that it was going to be Mark and Mike's positions?

21

A.    Yes.

Q.    Did he say why he picked those positions?

A.    Yes. We don't have any capital work to do. There's nothing for them to do, and we're not spending any money. The business is having a difficult time, so we were eliminating the positions.

Salewske also testified that he had discussed the elimination of these positions with Shah in November/December. Later in the deposition, Salewke was questioned as follows:

Q.    And then we're looking at your journal entry, Exhibit 21, where you make a notation. Did you make that notation on January 9?

A.    Yes.

Q.    Is that when you were told that the decision had been made to eliminate Mr. Crane and Mr. Egan's positions, or was it still a possibility?
      [objection to form of the question by defense counsel]
      You may answer
      [noted by plaintiff's counsel]
      The Witness: That it's a possibility.

Plaintiff's intent is to show that as of January 9, 2009, the elimination of plaintiff's position was still a possibility and that Salewske was not told the decision had been made until February 2, 2009, the day before plaintiff was informed. Initially, the court observes that prior to the "possibilities" testimony, Salewske affirmatively testified that as of the date noted in his journal, January 9, he had been told by Shah that there would be a staff reduction and that plaintiff's and Egan's positions would be eliminated. That having

22

been said, even considering the "possibility" response was given to a two-pronged question, a factfinder could infer from the questioning that prior to plaintiff's confirmed diagnosis on January 13, 2009, the final decision regarding the terminations had not been made. This goes to plaintiff's contention that he was terminated very shortly after his diagnosis.

What is also apparent from the testimony, however, is that as of January 9, 2009, both plaintiff's and Egan's positions remained targeted for elimination, just as when Salewske discussed their elimination in November/December 2008 and when Selle and Shah identified them for elimination in October/November 2008. Plaintiff has to show that he was singled out for impermissible reasons. *Williams*, 212 F. Supp. 2d at 784. This showing can be made by demonstrating that a non-protected person was treated better. *Id*. Plaintiff has not been able to do that in this case. Egan, like the plaintiff, was targeted for elimination back in October/November 2008 by Selle and Shah and was still targeted as of January 9, 2009. He was given notice of his termination very shortly after plaintiff received his. Egan is not disabled. He worked in the Technical Services Division on capital projects. Plaintiff's attempt to show Egan is not comparable to plaintiff because he has a legal background lacks merit. Proposed comparators must be similar in all relevant aspects. *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012). According to the record, Egan was a Construction Project Manager and is a licensed contractor who used that background in the Technical Services Division to work on capital projects with Salewske and plaintiff. Egan did not perform legal work for Technical Services.

23

Although plaintiff has not shown that a comparable non-disabled employee was treated better in the RIF, he has offered some other evidence that could show that he was singled out for impermissible reasons. The showing is sufficient to demonstrate a prima facie case, and therefore the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the termination.

Defendant has of course articulated a legitimate, nondiscriminatory reason for plaintiff's termination, the RIF. The burden then shifts back to plaintiff to show that the reason is a pretext for discrimination. In order to demonstrate pretext, a "plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009); *see also Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 804 (6th Cir. 1994) (plaintiff must do more than impugn employer's asserted justification; "plaintiff must also adduce evidence of the employer's discriminatory animus").

With regard to pretext, the Sixth Circuit has stated:

> To raise a genuine issue of material fact on the validity of an employer's explanation for an adverse job action, the plaintiff must show, again by a preponderance of the evidence, either (1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the action; or (3) that they were insufficient to motivate the action.

*Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 883 (6th Cir. 1996)(citations omitted).

"Pretext is a commonsense inquiry: did the employer [take the adverse employment action

24

against] the employee for the stated reason or not? This requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so how strong it is." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009). "As the Supreme Court has made clear, [the plaintiff] was required to provide not only evidence from which the finder of fact could conclude that [defendant's] proffered reason is false, but also evidence from which the factfinder could conclude that [defendant's] action was intentionally discriminatory." *Smith v. Allstate Ins. Co.*, 195 F. App'x 389, 395 (6th Cir. 2006) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993) ("It is not enough, in other words, to *dis* believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.")). At all times, the ultimate burden of persuasion remains with the plaintiff. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

As a basis for pretext, plaintiff attempts to cast doubt on the legitimacy of the freeze on the capital budget and the RIF, arguing that the defendant "has blown the matter way out of proportion." The court has already addressed the legitimacy of the RIF in this case. The RIF is not pretextual, and the plaintiff cannot show that there is no basis in fact for the RIF.

Plaintiff also argues as a basis for pretext that the decision-maker Shah gave a harsh and biased reaction when he learned of plaintiff's cancer as it would "disrupt the projects." The court has allowed for consideration plaintiff's testimony that Salewske told him later in December 2008 that "Shah was angry and upset that I had prostate cancer, and

25

that I'd have to take FMLA, and it would disrupt the projects." As discussed above, Salewske denies making the statement, and Shah has testified that he did not know about plaintiff's cancer until he was notified of the diagnosis on January 14, 2009. Plaintiff did not get a confirmed diagnosis until January 13, 2009, so his statement in the December 2008 quote that "I had prostate cancer" is somewhat misleading. After the confirmed diagnosis, plaintiff says Salewske told him Shah had the same response of being angry and upset about his condition and need for FMLA leave that would disrupt the projects. However, the conversation plaintiff says he had with Shah after the diagnosis was confirmed in which he says Shah was angry did not include a discussion of plaintiff's condition, only the projects. To conclude as plaintiff wishes that he was angry about the cancer would require speculation.

This evidence tends to cast doubt on defendant's reason for terminating plaintiff, the RIF. How strong is the evidence? *Chen,* 580 F.3d at 400 n.4 (court asks whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so how strong it is). The record reflects that Shah was the final decision-maker and the comments could be interpreted as indicating a discriminating animus toward plaintiff because of his illness.

Also, plaintiff argues that Shah was angry and upset because his cancer would require his being off work and that would "disrupt the projects." Yet Shah was already faced with the disruption of the projects because of the RIF, and had been since plaintiff's and Egan's positions had initially been identified for elimination in October/November 2008.

26

Certainly Shah had to realize that eliminating two positions in the Technical Services Division would "disrupt" the projects. The elimination of both plaintiff's and Egan's positions remained on target for elimination in November/December when Shah discussed them with Salewske and were still on track for elimination on January 9, 2009, based upon Salewske's journal entry and conversation with Shah. Both plaintiff and Egan were terminated at virtually the same time. Certainly, eliminating both of these positions in Technical Services at the same time would "disrupt" the projects. However, how strong a motive the disruption of projects may or may not have been or whether it was a motive at all for Shah in deciding to terminate plaintiff is a question for the factfinder.

Another reason offered by plaintiff that his selection was a pretext for discrimination is that he contends he was more versatile than his supervisor Salewske. Plaintiff offers nothing but his own personal opinion in support of this contention. This offering is insufficient. *Cf. Southmayd v. Apria Healthcare, Inc.*, 412 F. Supp. 2d 848, 857 (E.D.Tenn. 2006) ("[P]laintiff's conclusory opinion that he was better qualified than another employee who was retained in a RIF is insufficient to establish a prima facie case of age discrimination."); *Mynatt v. Lockheed Martin Energy Sys.*, 271 F. App'x 470, 477 (6th Cir. 2008) ("A plaintiff's contention that he was better qualified than the workers who were retained is insufficient to establish a prima facie case."). Furthermore, "an employee's evaluation of his own performance or qualifications is irrelevant as a matter of law." *Id*. (citing *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987) (plaintiff's "perception of his

27

competence, and the incompetence of those competing against him, is irrelevant"). This contention has no merit and does not show that defendant's reasons are false or that the action taken was intentionally discriminatory.

Another factor plaintiff raises as a showing of pretext is Egan's legal background; the fact that he performed contract work after he was terminated; and the fact that Shah told Egan to apply for an open position with the company. The court has already discussed that plaintiff's contention regarding Egan's legal background is without merit. Salewske testified that Egan worked for a few days over a month or two to finish a permit on a project he had been working on. Shah told Egan to apply for the position of a maintenance manager that was being replaced. Egan was not qualified for the job, and he did not get hired. Egan's working for a few days to complete a permit and his trying for a job he did not get do not change the result that like the plaintiff Egan was terminated under the RIF. Since these events occurred after the termination, they do not really enhance plaintiff's contention that he was singled out because of his cancer or show that Egan was treated better than plaintiff at the time they were both eliminated. Nonetheless, a factfinder could infer that Shah chose to help Egan for whatever reason.

Further, plaintiff offers as demonstrating pretext an email sent by Selle on January 22, 2009, which he refers to as a "smoking gun." The email states, "I see we paid $1,000 for Mark Crane last week. He is a problem employee that may file a workers' comp or EEOC claim. What was the charge for? Diagnosis?" Plaintiff argues that Selle as a

28

"decision maker" was making a derogatory remark a few days before plaintiff's termination.

Selle testified that the email was related to a weekly reconciliation regarding claims paid by defendant's healthcare carrier. He stated he thought the amount referenced was for a routine physical. When asked about his comment that plaintiff was a "problem employee," the following exchange occurred:

> A. This is not firsthand knowledge. It's third or fourth-hand that he had indicated to some people that he was thinking of filing a Workers' Comp claim. And I recall something, again fourth-hand, that he felt discriminated against.
>
> So my real point in sending this e-mail was to make sure that this was something other than a Workers' Comp claim, because those tend to get commingled.
>
> Q. When you sent this letter, did you realize that Mr. Crane had cancer?
>
> A. No, I didn't.
>
> Q. Did you at any time learn that?
>
> A. Subsequent to this, yes.
>
> Q. How did you learn it
>
> A. I believe Shah told me.

Selle later testified that he did not know of plaintiff's cancer until February.

The court fails to see this email as the "smoking gun" as characterized by plaintiff. Selle was not the decision maker who made the final decision regarding the elimination of plaintiff's and Egan's positions. He testified that he learned about that decision from Shah. This email was sent prior to Selle's having knowledge of plaintiff's cancer, since he testified that he learned about the cancer in February. Plaintiff has not presented any evidence to place that fact in question. Thus, when the email was sent, Selle did not know of plaintiff's cancer and ultimately did not make the final decision to terminate him. In addition, plaintiff has not linked the email to the person who did make the final decision, Shah. The following exchange occurred in Shah's deposition when he was asked directly about the email:

> Q. Have you ever seen this e-mail before?
>
> A. No.
>
> Q. Do you know what Mr. Selle is referring to?
>
> A. No.
>
> Q. Did you discuss with Mr. Selle that Mark Crane may file an EEOC claim?
>
> A. No.

Plaintiff has not offered any evidence to place in question the fact that Shah had no knowledge of the January 22, 2009 email. Thus, plaintiff has not connected the email to the final decision-maker or his termination. Without linking the email to the decision-maker, a factfinder could not conclude Shah's action was intentionally discriminatory based upon it,

30

so the email does not advance plaintiff's pretext argument.

Plaintiff's other argument to show pretext is that in spite of his seven performance evaluations in which he received a "good or above average" rating he was deemed not rehireable on his termination papers. Ayala testified that the designation was "probably an error on my part" because "I'm usually told if they're not rehireable, and in this case because there were so many salaried PAF's getting done that last minute, I would say I overlooked that for both of them." Egan's termination papers were marked the same way; yet he returned briefly to finish a project and applied for another position. These facts really do not do much more than show that Ayala, the person preparing the termination papers, made a mistake in designating both plaintiff and Egan as not be rehireable. Plaintiff has not offered proof to show that Shah, Selle, or Salewske or anyone else told Ayala to designate plaintiff as not rehireable, and she stated that she is usually told if someone is not rehireable. That apparently did not happen in this case. This argument by plaintiff really does not advance his showing of pretext, although a factfinder could choose to infer something negative from the circumstance.

This is a close case. There is a basis in fact for the RIF, so that is not reason for finding defendant's reason a pretext. The RIF is a sufficient ground for termination as well. However, plaintiff has offered evidence that puts at issue whether the actual motivation for defendant's termination of plaintiff was the RIF or intentional discrimination based upon his cancer. On that basis, summary judgment as to plaintiff's ADA claim is not

31

appropriate.

## FMLA Claims

The FMLA provides two theories of recovery, the "interference" theory and the "retaliation" theory. *Hoge v. Honda of Am. Mfg., Inc*., 384 F.3d 238, 244 (6th Cir. 2004). Plaintiff asserts both theories in this case.

### Interference Claim

An "interference" claim is based upon 29 U.S.C. § 2615(a)(1) which states, "It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this title." In order to prevail on an interference claim, a plaintiff must demonstrate the following:

> (1) she was an eligible employee, (2) the defendant was an employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave the employer notice of her intention to take leave, and (5) the employer denied the employee FMLA benefits to which she was entitled.

*Edgar v. JAC Prods., Inc*., 443 F.3d 501, 507 (6th Cir. 2006). The intent of the employer is not relevant in an interference inquiry. *Id*. (citing *Arban v. West Publ'g Corp.* 345 F.3d 390, 401(6th Cir. 2003) ("Because the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer."). However, the FMLA is not a strict-liability statute; thus, "employees may be dismissed so

long as the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave." *Id*. 507-08 (quoting *Smith v. Diffee Ford-Lincoln-Mercury, Inc*., 298 F.3d 955, 961 (10th Cir. 2002)). "Employees seeking relief under the [interference] theory must therefore establish that the employer's violation caused them harm." *Id*. at 508 (citation omitted).

The *McDonnell Douglas* burden-shifting analysis applies to FMLA interference claims. *Donald v. Sybra, Inc*., 667 F.3d 757, 762 (6th Cir. 2012). Therefore, if plaintiff demonstrates a prima facie case of interference under the FMLA, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its adverse employment action. *Bryson v. Regis Corp*., 498 F.3d 561, 570 (6th Cir. 2007). Once the defendant meets this burden, the plaintiff must show that the proffered reason is a pretext for unlawful discrimination. *Id*. The ultimate burden of persuasion to demonstrate that the defendant intentionally discriminated against the plaintiff remains with the plaintiff at all times. *Id*.

Defendant argues *inter alia* that plaintiff cannot prevail on his interference claim because plaintiff did not give notice and he cannot show that he was harmed because his position was to be eliminated whether or not he took FMLA leave.

Defendant's notice argument is based on the fact that plaintiff did not formally apply for FMLA leave until after he received notice of his termination. However, formal notification is not required.

33

> An employee can provide sufficient notice to his employer that he needs FMLA-qualifying leave without invoking the FMLA and without using the words "leave" or "leave of absence." The notice is sufficient if the employee provides enough information for the employer to reasonably conclude that the leave is needed for a serious health condition.

*Schrack v. R+L Carriers, Inc.*, No. 1:10cv603, 2012 WL 2309365, at *8 (S.D. Ohio June 18, 2012) (citing *Cavin v. Honda Mfg., Inc.*, 346 F.3d 713, 725) (internal quotation marks and citations omitted)). In *Schrack*, the court concluded that "plaintiff gave defendant sufficient notice of a serious medical condition prior to his initial termination by informing his supervisor, Wallace, at the end of March 2009 that he had been diagnosed with narcolepsy and he needed medical attention and time off work to obtain medical treatment for his condition." *Id.*, at *9.

As discussed above, plaintiff has testified that in December 2008 he got a reaction from Shah through Salewske concerning his potential need to take FMLA leave. He testified to receiving the same response regarding the need for FMLA leave through conversations with Salewske after his diagnosis was confirmed. Plaintiff also testified that Salewske asked him on numerous occasions how long he would be out for treatment. These statements indicate adequate notice to defendant of plaintiff's intent to take FMLA leave. This would satisfy the fourth element of plaintiff's prima facie case. There seems to be no dispute that plaintiff can show the first three elements.

Defendant also argues that plaintiff cannot sustain an interference claim because the decision to eliminate his position was made before he took FMLA leave and

therefore he cannot show he was harmed. However, as discussed above, there are questions of fact concerning exactly when the final decision to terminate plaintiff was made. Defendant also contends that plaintiff's dismissal would have occurred regardless of his taking FMLA leave because of the RIF. Nevertheless, plaintiff has presented certain evidence from which a finder of fact could infer that the final decision maker improperly singled plaintiff out based upon his need for FMLA leave.

"[I]f an employer takes an employment action, in whole or in part, on the fact that the employee took FMLA-protected leave, the employer has denied the employee a benefit to which he is entitled." *Donald,* 667 F.3d at 761. "An employer is thus liable for interference if it uses FMLA leave as one factor in deciding to terminate an employee." *Hajizadeh v. Vanderbilt Univ.*, No. 3:10-cv-00817, 2012 WL 2947586, at *7 (M.D. Tenn. July 19, 2012) (citing *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 448 (6th Cir. 2007)). There is at least a question of fact concerning the fifth factor of the prima facie case, whether FMLA leave was a factor in terminating plaintiff. The testimony concerning Shah's response to plaintiff's need for FMLA leave raises an issue as to his motivation since he was the final decision-maker. This would preclude summary judgment.

The court notes, however, the plaintiff's argument concerning David Fullington does not contribute to the court's finding of an issue for trial. Plaintiff's contention that Fullington was demoted after he took FMLA leave is not supported by the record and is based on speculation. Fullington is not a comparable employee to plaintiff. He worked in

35

California in a different division as a packing manager and then a farm manager and reported

to a different supervisor. He testified that he did not formally take FMLA leave, although

he did take time off from work to take care of his wife during her illness with cancer. When

asked to his knowledge whether his absence from work for that purpose had been criticized

by Shah, Fullington replied, "Absolutely not."

> Fullington's supervisor, Clark Smith, testified as follows in an affidavit:
>
> In 2008 and 2009 I was David Fullington's supervisor. In 2008 and 2009 Royal Oaks farm, where Mr. Fullington was General Manager, was not meeting expectations and financial results were significantly below plan. Accordingly, I made substantial changes to the personnel at Royal Oaks including moving David Fullington to the position of Packing Manager in January 2009. In February of 2010 I transferred Mr. Fullington to the position of Farm Manager at Mushroom Farms. Mr. Fullington's job changes had nothing to do with the fact that he took some time off because his wife had cancer.

Plaintiff's contentions concerning Fullington's situation are speculative and do not advance

his FMLA interference claim.

> Defendant also argues that plaintiff cannot show pretext. However, there is a

question of fact regarding the actual motivation for plaintiff's termination. As discussed

above, the RIF was based in fact and a sufficient basis for termination. There is evidence

putting that actual motivation for the discharge at issue. Shah's reaction to plaintiff's need

for FMLA leave and the timing of plaintiff's making his need for leave known and his

termination raises material issues of fact as to pretext that preclude summary judgment.

36

<u>Retaliation Claim</u>

An FMLA "retaliation" or "discrimination" claim arises under 29 U.S.C. § 2615(a)(2), which provides, "It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this title." The *McDonnell Douglas* burden-shifting analysis applies to FMLA retaliation claims. *Donald*, 667 F.3d at 762; *see also Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001). To demonstrate a prima facie case of retaliation under the FMLA, a plaintiff must show that:

> (1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006) (citing *Arban,* 345 F.3d at 404). Once plaintiff has made this showing, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for the employment action. *Skrjanc*, 272 F.3d at 315. If the defendant states such a reason, the burden shifts to plaintiff to show that the given reason is really a pretext for discrimination. *Id*.

Defendant argues that plaintiff did not notify defendant of his intent to take FMLA leave until after he was notified of his layoff. However, as discussed above, there is evidence that plaintiff gave notice before he formally applied for FMLA leave. Defendant also argues that the decision to terminate plaintiff's position was made in October/November

2008 and the final decision was made by Shah in December 2008. There is evidence offered by plaintiff that places at issue when the final decision to terminate plaintiff may have been made. Thus, there is an issue as to Shah's knowledge of plaintiff's need for FMLA leave, which plaintiff says was as early as December 2008, and the timing of the final decision to terminate the plaintiff.

Defendant also contends there is insufficient evidence to establish the causal link prong of the prima facie case. Again, cumulatively and viewed in the light most favorable to the plaintiff, enough evidence exists to create a question of fact as to this element. There is plaintiff's testimony concerning the information he received from Salewske as to Shah's angry response in December 2008 and after his diagnosis to plaintiff's need for FMLA leave; the question as to whether the terminations remained a "possibility" as of January 9, 2009; and the email from Ayala indicating that the terminations might have been last minute. In addition temporal proximity can infer a causal connection. *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 554-55 (6th Cir. 2002) (temporal proximity alone not sufficient to support inference in face of compelling evidence to contrary but proximity in time between protected activity and adverse employment action may give rise to inference of causal connection.).

Defendant further contends that the evidence is such that plaintiff cannot establish pretext. However, as discussed above, there is evidence to raise issues of fact concerning the actual motivation for discharge, the RIF or plaintiff's exercise of his rights

38

under the FMLA.  Again, this is a close case, but on summary judgment the court does not weigh the evidence or judge the credibility of witnesses.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  There are questions of fact regarding the evidence offered by the plaintiff that are for the factfinder to determine.


## IV.

### *Conclusion*

Accordingly, for the reasons stated herein, defendant's motion for summary judgment will be denied, and this case will proceed to trial.  An order consistent with this opinion will be entered.


ENTER:


_____  s/ Leon Jordan  _____
United States District Judge